Edgar T. BURCH, d/b/a Burch Real Estate Company (Plaintiff), Appellant,

v.

Alvine SCHMELIG and Silas Cain, Defendants,
Alvine Schmelig (Defendant), Appellant,
Silas Cain (Defendant), Respondent.

No. 29493.

St. Louis Court of Appeals.

Missouri.

April 2, 1957.

Motion for Rehearing or to Transfer to Supreme Court Denied May 3, 1957.

William W. Sleater, III, William W. Sleater, Jr., St. Louis, for appellant Edgar T. Burch.

Ziercher, Tzinberg, Human & Michenfelder, Clayton, for appellant Alvine Schmelig.

Donald E. Fahey, St. Louis, for respondent.

ANDERSON, Judge.

This is an appeal from a judgment on a counterclaim filed by defendant Silas Cain in an interpleader action brought by Edgar Burch, as plaintiff, against said defendant and Alvine Schmelig. The judgment, rendered at a separate trial of the issues raised by the counterclaim, was in favor of defendant Cain and against plaintiff Burch and defendant Schmelig. Burch and Schmelig have appealed.

In said counterclaim respondent alleged that he entered into an earnest money contract, dated June 7, 1954, with Alvine Schmelig, through her agent, Edgar T. Burch; that by said contract he intended to purchase the property known as 10137 Olive Street Road, which Burch and Mrs. Schmelig represented as having dimensions of 75 feet by 300 feet; that both Burch and Mrs. Schmelig knew that such were his intentions; that Burch represented to him that said property was 75 feet by 300 feet in dimension, and that he relied on said representation in signing said earnest money contract.

It was further alleged that after signing said contract Cain paid Burch the sum of $500, and on August 14, 1954, the sum of $2,000; that after the payment of said earnest money in the sum of $2,500 he discovered that said property was not 75 x 300 feet, as represented by Alvine Schmelig and her agent Edgar Burch, but was 300.62 x 75 x 273.83 x 63; that upon making this discovery he informed Alvine Schmelig and Edgar Burch that he elected to rescind said contract and demanded a return of his payments.

It was further alleged that Alvine Schmelig at all times knew that said property was not of the size as represented in said contract, and that Edgar Burch had actual knowledge that said property was not 75 feet x 300 feet, having been so informed by the said Alvine Schmelig; and that Edgar Burch deliberately, wilfully and fraudulently represented said property to be larger than it was, with intent to deceive respondent and induce him to purchase said property.

The prayer of said counterclaim was for judgment against Edgar T. Burch and Alvine Schmelig in the sum of $2,500, being the amount of the earnest money paid, and the further sum of $1,000 damages and costs, including a reasonable attorney's fee,

and for cancellation of the contract of June 7, 1954.

Alvine Schmelig filed a separate answer to said counterclaim. In said answer she admitted entering into said contract, but specifically denied that respondent had been induced to sign said contract by the alleged misrepresentation of Edgar Burch. It was then alleged that Alvine Schmelig had no knowledge concerning the truth or verity of the allegation of the counterclaim with reference to the payment of $2,500 to Burch. All other allegations of said counterclaim were denied.

Edgar T. Burch, in his answer, denied generally each and every allegation of said counterclaim. It was then alleged that Silas Cain had knowledge of the size and shape of said premises prior to entering into said earnest money contract.

Alvine Schmelig is the sole owner of the parcel of real estate involved in this case. It is improved with a seven room brick residence and a frame garage. It is located on Olive Street Road in the town of Creve Coeur. Desiring to sell, Mrs. Schmelig listed the property for sale with appellant Edgar T. Burch, a real estate agent doing business as Burch Real Estate Company. The listing contract was entered into on May 18, 1954. In it the property was described as to size as follows: "7̶0̶ – 63 x 300."

Burch thereafter placed his "For Sale" sign upon the property, giving thereon the information as to where and how he could be reached. On June 5, 1954, Cain noticed the sign and called Burch on the telephone. As a result of this call Burch came out and showed Cain the property. At that time Cain asked Burch the size of the property and, according to Cain's testimony, Burch told him it was seventy-five feet wide by three hundred feet long. Mr. Cain further testified:

"Mr. Burch told me that the lot that I was buying was 75 feet x 300. * *

I asked him to show me a plot plan of the property. He said he didn't have any. I said: 'Where can I find out about this? Haven't you got a plot plan somewhere to show me?' * * He told me that he was sure of its width, the length was approximate, or maybe a little more, * * * but he was positive of the width, that the width was exactly 75 feet wide from one end to the other; he was sure of that."

Mr. Burch testified that when he and Cain inspected the property he told Cain that it was an irregular shaped lot, and that he did not have the exact dimensions at that time, but did have the exact dimensions at his office.

The next day Cain went to Burch's office and, after some discussion, decided to buy the property. An earnest money contract was drawn up by Burch and signed by Cain. It acknowledged the receipt

"of $500 as earnest money and part purchase money for a certain parcel of real property lying in the County of St. Louis, State of Missouri, described as follows:

"Seven-room brick residence, two car garage; lot size 75′ x 300′ approximately. Title to govern legal description of property.

"together with improvements thereon known and numbered 10137 Olive Street Road, which property is this day sold to Silas M. Cain for the sum of Twenty-Thousand and No/100 ($20,-000.00) Dollars, to be paid in cash upon the date of closing this sale, of which earnest money is a part and the balance payable as follows:

"Subject to G. I. Appraisal of $20,-000 or less, and 20-year G. I. loan."

September 15, 1954, was the closing date fixed by the contract. Mrs. Schmelig was not present at the time Cain signed the contract. She signed this contract at a later date.

Burch testified that at the time the contract was entered into he had at his office a certificate of title on the property which he had received from Mrs. Schmelig. Attached to it was a plat of the property. He stated that he had received it the week following the signing of the listing contract. He testified: "The reason I received it that early was the fact that we had originally thought the property to be 70 feet, and when we held it out to be 75 feet, I wanted the title to verify the true condition of this property." He further stated that this certificate of title was given to Mr. Cain to show him the size of the lot, but that it was not discussed in detail. He merely stated to Cain: "This will give you the dimensions of the property and show you approximately the shape of the lot." When asked by the court why, after he himself had looked at the dimensions shown by the certificate of title, he put on the dimensions in the earnest money contract as 75 x 300, the witness replied: "The earnest money contract itself is an informal contract, and we also indicated on the earnest money contract that title is to govern the legal description, which in our meaning means that the seller is selling only what she has title to, and that the title would indicate the exact amount and size of the lot. * * * We always put the front side and one of the other sides down on an earnest money contract. That is our procedure. * * * Generally speaking, we put the longest side down."

Mr. John A. Fink, who was present at the time, testified that he did not recall any conversation between Burch and Cain about the irregular shape of the property or about the plat. He did state that there was a plat lying on the table in front of Cain.

Mrs. Schmelig testified that she did not give the certificate of title to Mr. Burch until after Cain had agreed to buy the property; that it was sometime around the middle of June that she gave it to him.

Cain testified that he did not remember seeing a certificate of title open on the table in front of him. He stated that he asked Mr. Burch for a plat or description of the property at the time, and Mr. Burch answered that he had none. Cain testified that the first time he ever saw the certificate of title was on September 15, 1954, at the office of the Mercantile Mortgage Company.

Cain, at the same time he signed the contract, executed a Request for Determination of Reasonable Value, addressed to the Veterans' Administration. This was a necessary preliminary step toward securing a loan on the property. The Veterans' Administration then ordered an appraisal of the property. The property was thereafter appraised at $20,740, after which the Veterans' Administration issued its Certificate of Reasonable Value establishing said value at $20,000. Cain then executed an application to the Veterans' Administration for a Home Loan Guaranty for $18,000. On September 2, 1954, the Veterans' Administration issued its certificate of commitment to the Mercantile Mortgage Company with whom Cain had arranged for a loan of $18,000.

On August 24, 1954, Cain sent Burch a check for $2,000. The circumstances under which it was sent were testified to by Cain as follows: "Mr. Burch asked me some time in July that he would have to have more money, additional money shortly, because the deal was going through. I said, 'Well, I have it any time you are ready for it.' So he told me then there would be additional costs, closing costs, year's insurance, taxes, certain other costs would run $300.00 or $400.00 at least, so I gave him enough to cover all necessary costs. I gave him this check after we were reasonably sure, after he had assured me that the Veterans would consider a loan and was reasonably sure that it was going to be a deal. And I gave him the $2,000.00 check."

Burch testified that after the commitment from the Veterans' Administration had been received, Cain phoned him and asked him if he wanted any more money. He stated that he told Cain, "It is entirely up to you. We could leave it go until the time of closing or you could send additional

money now." Cain said, "I will send you $2,000.00 more."

On August 27, 1954, Cain moved his trailer onto the property after securing the consent of Mrs. Schmelig. He lived in the trailer, but used the bathroom facilities of the house. During the next week-end, September 4th and 5th, while dragging weeds on the lot, Cain observed, "When I got to the back end of the lot, I didn't have as much room as I had in front, it looked a little wider on one end than the other. So I got curious and I got a tape measure and I went to the back of the lot and measured the width of it." He drove a stake at what he thought was the boundary of the lot and ran the tape measure, and "when I was out 75 feet, I was out in the middle of my neighbor's back yard, and I stepped it off there and it couldn't possibly be more than 65 feet, the way I measured it then. And I was measuring two feet of his property. It was actually 63 feet." The stake he drove at what he thought was his boundary was actually two feet inside the adjoining lot. Cain further testified: " * * I went back and phoned Mr. Burch. * * I called him at his office and I said, 'Are you sure that this lot is 75 feet wide?' and he said, 'Yes, I am positive,' and I said, 'It can't possibly be. If it is 75 feet wide, these other people are way off base,' and he said, 'Well, it is. I have seen the plot and it is 75 feet from side to side.' "

Cain had previously requested a survey of the property and a certificate of title. This was necessary in order to secure the loan. On September 9, 1954, Mr. Burch called Cain on the phone and told him he had the results of the survey. Burch told Cain that the survey showed one side of the property to be 274 feet and the other 300 feet; that it showed the front as 75 feet and the rear 64 feet. When Cain asked him why he had said that the rear was 75 feet, Burch replied: "Well, I thought it was," or words to that effect. Cain further testified that he said to Burch: " 'Did Mrs. Schmelig, say, did the owners list that property to you as 75 x 300 feet?' He said, 'I don't know. I

will look up and see.' He was gone and in a few seconds he came back and said, 'She listed it at 65 feet all right.' I said, 'Why did you push it up a little bit and tell me it was 75 feet instead of 65?' I don't know what answer he gave, but I was very disappointed."

Cain moved from the property on September 11, 1954, and on the following day returned to Mrs. Schmelig the key to the premises. When he told Mrs. Schmelig of Burch's alleged misrepresentation with respect to the size of the lot, Mrs. Schmelig denied ever telling Burch that the rear of the lot was 75 feet wide.

On September 15, 1954, the closing date specified in the earnest money contract, Cain, Mrs. Schmelig, Burch, and the latter's attorney, met in the office of the Mercantile Mortgage Company. At this meeting a deed was tendered to Cain and a demand made upon him for the balance of the purchase price. Cain refused to go through with the deal, but offered to complete the purchase and pay an extra $1,000 if Mrs. Schmelig would purchase from the adjoining lot owners sufficient land to make her property the size as had been represented. This proposition was not accepted. Cain, in a letter dated September 16, 1954, demanded the return of his deposit, basing his refusal to carry out the contract on the ground that the actual size of the property was less than was represented in the earnest money contract. Mrs. Schmelig also demanded payment to her of the funds held by Burch. On September 20, 1954, Burch filed his bill of interpleader and paid into court the sum of $2,168.77, alleged to be the amount remaining in his hands of the $2,500 paid to him by Cain, after the expenditures called for in the earnest money contract had been paid, together with the cost of a water heater installed in the premises at Cain's request, and an attorney's fee.

The court found for defendant Cain and against plaintiff and defendant Schmelig in the principal amount of $2,500, together

with interest from September 16, 1954, in the sum of $132.30. Judgment in the sum of $2,632.50 was then entered.

Appellants' first point is that the trial court erred in admitting the testimony of defendant Cain relative to what occurred prior to the signing of the earnest money contract. In support of this contention appellants invoke the parol evidence rule.

■■■ It is quite true, as appellants contend, that it is a well settled rule of law that where a person signs a contract he is conclusively presumed to know its contents, and to have accepted the terms thereof, and that all prior negotiations are merged into the written instrument. But there is an exception to this general rule in the case of fraud. In such cases the party does not sue upon the contract or any warranty therein, but seeks to avoid his undertaking on the ground that by false representations he was induced to enter into the contract, and for that reason he should be relieved from his obligations and placed in status quo. Parol evidence in support of such plea is admissible. Leicher v. Keeney, 98 Mo.App. 394, 72 S.W. 145; Messerli v. Bantrup, Mo.App., 216 S.W. 825; Stoltzfus v. Howey, Mo.App., 54 S.W.2d 501; Judd v. Walker, 215 Mo. 312, 114 S.W. 979; Horne v. John A. Hertel Co., 184 Mo.App. 725, 171 S.W. 598. In the case at bar the evidence complained of was introduced in support of a plea that defendant was induced to enter into the contract by reason of false representations as to the size of the lot. For such purpose the evidence was admissible.

■■ But it is urged that defendant Cain's counterclaim failed to state a cause of action for fraud. We find no merit to this contention. Taken as a whole, with all the matters necessarily implied, the counterclaim stated a good cause of action for fraud and deceit. From the analysis we have heretofore made of this pleading it will be observed that all the necessary elements of a cause of action are stated. It alleged the falsity of the statement,

scienter on the part of Burch and Mrs. Schmelig; the deceptive purpose of the fraudulent representation; lack of knowledge of the falsity upon the part of Cain, as well as reliance on said representation by Cain to his injury. In our judgment a cause of action was stated. Messerli v. Bantrup, Mo.App., 216 S.W. 825.

■■■ Appellants also contend that the necessary elements of fraud were not proven. Specifically, it is urged that since the true facts with reference to the dimensions of the lot were readily available, Cain will not be heard to say that he was defrauded. It is pointed out that the earnest money contract contained the notation, "Title to govern legal description;" that the title certificate containing a plat and legal description was available to Cain at the time the contract was signed; and that all of the documents in connection with the loan set out the legal description.

It is true plaintiff testified that at the time the contract was entered into he had a certificate of title to the property and told Cain that it would give him the dimensions of the property and approximate shape of the lot. Mr. Fink also testified that a certificate of title was on the table in front of Cain. However, Cain testified he did not see the certificate of title, and Mrs. Schmelig testified that it was some days later that she delivered it to Burch. Cain testified that the first time he saw the certificate of title was on September 15, 1954, at the office of the Mercantile Mortgage Company. But whether the certificate of title was there or not is not decisive of the case. We are convinced that Cain did not examine it at the time and, under the law, he will not be defeated in his action because he had the means of knowledge, if there was a positive representation of fact. Judd v. Walker, 215 Mo. 312, 114 S.W. 979; McGhee v. Bell, 170 Mo. 121, 70 S.W. 493, 496, 59 L.R.A. 761. In the latter case, the court said:

"The contention that plaintiffs cannot complain of the deceit practiced

upon them, and the wrongs resulting therefrom, because they had the means to ascertain the true quantity of the land, will not be countenanced in a court of conscience. As was said in Starkweather v. Benjamin, 32 Mich. 305: 'It can not be generally true that persons can judge of the contents of a parcel of land by the eye. When a positive assurance of the area of a parcel of land is made by the vendor to the vendee with the design of making the vendee believe it, that assurance is very material, and equivalent to an assurance of measurement.' "

Nor does the use of the phrase "Title to govern legal description," and the word "approximately" in the description, afford a shield against liability for false representation. Eutsler v. Mixon, Mo.App., 77 S.W.2d 655.

It is true that the mortgage papers contained a description of the property, but the evidence is clear that Cain never saw the description until after the contract was signed. The only paper executed at the time the contract was signed was the Request for Determination of Reasonable Value, addressed to the Veterans' Administration. Cain signed this in blank, and it was filled out later by Burch.

In our opinion, the other elements of fraud were clearly proven. That the alleged representation was made appears from plaintiff's testimony and the contract itself. That Burch knew his statement was false can be inferred from the fact that he had in his possession a listing contract showing the true dimensions and—if any credence is to be given his testimony—a plat of the property with like information. The difference between the size of the lot as represented and its actual size was so great as to be material and substantial. Therefore the existence of a fraudulent intent may be inferred, for such deduction may be made when one knowingly misstates a material fact, knowing that the party to whom it is made will rely thereon.

Brooking v. Shinn, 25 Mo.App. 277. Cain did rely on the representation, signed the contract, and parted with his money.

In our view, the findings and judgment below were for the right party. The judgment is affirmed.

RUDDY, P. J., and MATTHES, J., concur.