**Ralph B. HUTCHINGS, (Plaintiff) Respondent,**

v.

**Sherman L. TIPSWORD, (Defendant) Appellant.**

No. 31010.

St. Louis Court of Appeals.

Missouri.

Dec. 18, 1962.

Motion for Rehearing or to Transfer to Supreme Court Denied Jan. 14, 1963.

Joseph Nessenfeld, Richard Marx, St. Louis, for appellant.

Goldenhersh, Goldenhersh, Fredericks, Newman & Lane, and Frank J. Lane, Jr., St. Louis, for respondent.

ANDERSON, Presiding Judge.

This is an action brought by plaintiff, Ralph B. Hutchings, against defendant, Sherman L. Tipsword, for damages based upon alleged fraudulent representations by said defendant. There was a verdict and judgment below in favor of plaintiff in the sum of $2,923.10. Defendant has appealed from the judgment.

The case was tried upon a second amended petition. In said petition it was alleged that defendant caused a corporation, King-Nat Company, Inc., to be organized, and solicited plaintiff to purchase shares of said Company. It was further alleged that defendant at said time did falsely and fraudulently represent to plaintiff that such shares were valid, subsisting and authorized by the corporation and registered on the books of the corporation; that in ignorance of the falsity of the representations and in reliance thereon, plaintiff purchased 14 shares of the stock which were issued in two certificates, one for 12 shares and one for 2 shares; that about August 1, 1956, the corporation retired its capital shares and paid plaintiff $17,538.60 for 12 shares; that thereafter plaintiff requested that the certificate for 2 shares be retired on the same basis; that then defendant acknowledged that said certificate had been issued by him personally, and was not of record on the corporate books of the corporation, and at said time plaintiff learned that said certificate representing 2 shares was not

valid, and not authorized or of record on the corporate books; that defendant intentionally caused the certificate to be issued, knowing that said shares were not registered on the corporate books and were not authorized and that defendant did so with intent to defraud plaintiff. The prayer of the petition was for actual damages in the sum of $3,023.10, and punitive damages in the sum of $5,000.00.

Defendant's answer in addition to a general denial alleged that he was one of the incorporators of the corporation; that such corporation was dissolved and that plaintiff was paid $17,538.60 for his stock interest in the corporation pursuant to said dissolution.

On December 10, 1952, defendant entered into a contract with Highway Frontage Corporation to purchase a parcel of real estate at Kingshighway and Natural Bridge in St. Louis. The purchase price, according to the terms of the contract, was $375,000.00 to be paid in the following manner; $10,000.00 paid as earnest money, $140,000.00 in cash to be paid at the consummation of the sale, and the balance of $225,000.00 by promissory notes secured by a deed of trust on the premises.

Shortly after defendant entered into the contract, he and his business partner interested a number of persons in the formation of a corporation to take over the contract of purchase and develop the property. Defendant was a used car dealer, and it appears that the initial plan of the parties was to convert the property into a used car arena, with a finance office and an insurance office on the premises. Plaintiff was an insurance broker and was selling defendant insurance at the time. He was desirous of obtaining the insurance business that would be available if the property was used as planned.

According to plaintiff, at some unspecified time prior to the organization of the corporation, but after defendant had entered into the earnest money contract for the purchase of the property, he had a discussion with defendant concerning this proposed purchase of the land and the proposed corporation. Plaintiff testified defendant told him at the time that there would be 100 shares of stock in the corporation at $1,500.00 a share, and asked him if he was interested, and if so how much he wanted to buy. Plaintiff stated that he agreed to buy 14 shares of stock; that it was his understanding that the corporation was to issue him 14% of the stock for $21,000.00.

The real estate agent who handled the purchase of the property was Leonard O'Brien. O'Brien also became interested in the proposed project and became one of the incorporators. He employed an attorney, Oliver Erbs, at his own expense, to prepare the Articles of Incorporation and to organize the corporation in accordance with law. He also employed a certified public accountant to assist Mr. Erbs. Mr. Erbs, according to O'Brien, thereafter prepared the Articles of Incorporation based upon information furnished him by Mr. O'Brien and defendant. Defendant denied talking to Erbs prior to the preparation of the Articles of Incorporation.

The name of the corporation as shown by the Certificate of Incorporation was "King-Nat Company". The Articles of Incorporation show that there was a total authorized capital stock of 100 shares of no par value, and that all of the shares were subscribed for by the incorporators. They also show $150,000.00 as the amount of capital paid in, and that it was then in the custody of the first Board of Directors. The Articles of Incorporation listed the names of the shareholders and the number of shares subscribed by each. Plaintiff is listed as having subscribed to 12 shares. Defendant subscribed for 43 shares; Earl Tipsword, defendant's brother, is listed as having subscribed for 8 shares; John Hargis, a business associate of defendant, subscribed for 8 shares; Leonard O'Brien, 6 shares; John Sherman, 6 shares; Norman Spitzer, 7 shares; Raymond Coleman, 6 shares, and Cleve Tipsword, defendant's father, 4

shares. The Articles were signed and sworn to by all the subscribers. Plaintiff stated he knew they were Articles of Incorporation, and knew what they were for when he signed; that he knew he was a part of the corporation and owned 14% of it. He testified that for his subscription he paid the sum of $21,000.00. The check in payment of this amount was made payable to O'Brien Real Estate Company, as were all payments, made by the subscribers to the stock of the Corporation. This was done pursuant to instructions from defendant. Payments were made some time in January, 1953, and were made for the purpose of completing the payment of $150,000.00 called for under the contract of purchase. The Articles of Incorporation of the King-Nat Company were issued on February 3, 1953, and the sale of the land was completed February 10, 1953. On that date shares of stock were issued to each of the incorporators in the numbers shown to have been subscribed by them in the Articles of Incorporation. The stock certificates were signed by the defendant, who was president of the corporation, and by O'Brien as secretary. Plaintiff did not recall from whom he received the certificate issued to him. However, he testified that immediately after receiving the certificate and finding that it was for only 12 shares, he talked to defendant about it; about the percentage they had agreed upon. This conversation took place on defendant's used car lot at Fair and Natural Bridge. According to plaintiff this conversation concerned the fact that he got 12 shares when it should have been 14 shares, and that defendant told him he would see he got the other 2 shares of stock. Defendant denied there was any such discussion.

Plaintiff further testified that defendant subsequently gave him a certificate for 2 additional shares of stock. This certificate is dated January 22, 1954. He stated that prior thereto he had, on numerous occasions, unsuccessfully sought to obtain these 2 shares of stock from the defendant. Plaintiff testified with reference to the issuance of this certificate as follows: "I had asked Tippy (defendant) for this certificate on many occasions, and finally on this particular date—we didn't exactly get into a hassle over it, but I just became insistent upon it, and he said 'Come on into the office, I will get you out of my hair', so to speak, and that's how it happened."

Plaintiff further testified that the incident occurred in the small office on the used car lot operated by defendant and his partners at Fair and Natural Bridge. No one but plaintiff and defendant were present. Defendant took the stock book out of a drawer, filled out a certificate for 2 shares in the name of plaintiff, dated it January 22, 1954, and signed it as President. Plaintiff said he receipted for the certificate on the stub of the stock book and thereupon left the office.

When defendant handed plaintiff the certificate, it lacked the corporate seal, and was not signed by the Secretary of the corporation. After leaving defendant's office, plaintiff telephoned Mr. O'Brien, the Secretary, and told him about receiving these 2 shares of stock from defendant, and asked O'Brien if he would sign the certificate as Secretary. Mr. O'Brien assured plaintiff that he would do so. Plaintiff then went to O'Brien's office and the latter signed the certificate as Secretary, and put the corporate seal on it. O'Brien testified that when plaintiff arrived at his office, plaintiff did not relate the circumstances under which he received the certificate but did say "I finally got my 2 shares of stock." O'Brien stated that he looked at the certificate and recognized defendant's signature, and knowing both plaintiff and defendant, and the integrity of each, signed it. Mr. O'Brien further testified that after the original certificate for 12 shares was issued there was a discussion in regard to the number of shares plaintiff should get—whether 12 or 14—and to the best of his knowledge plaintiff was claiming 14 shares instead of 12. According to O'Brien it did not come as a surprise to him when plaintiff brought in the certificate for two shares.

Defendant's position has always been that plaintiff subscribed for only 12 shares of stock, and that the amount paid by him in excess of $1,500.00 per share was plaintiff's contribution toward a promotional fee for defendant, which was agreed to by all the incorporators including plaintiff. According to defendant's evidence a meeting of the incorporators was held on January 20, 1953, prior to the actual organization of the corporation, at which time it was agreed that for defendant's assigning the contract of purchase to the corporation to be formed, and for his work in promoting the corporation, each of the other incorporators would pay, in addition to $1,500.00 for each share of stock, a further sum of $250.00 per share to the corporation to be used in payment of stock to be issued to defendant. Defendant testified that plaintiff agreed to this, saying it was "Fine with me, Tippy". Spitzer, Earl Tipsword and John Thurman gave testimony with respect to this meeting, and all stated that plaintiff was there and agreed to the fee arrangement. O'Brien testified he did not know if there was any meeting prior to the formation of the corporation, at which plaintiff was present, where this fee was discussed, but it had been discussed between plaintiff and defendant. He did not remember whether this was before or after January 20, 1953. Defendant testified he had never discussed this matter privately with plaintiff prior to this meeting, but claimed that his partner, Hargis, had spoken to plaintiff about it. The other incorporators did not testify. Defendant testified that each of the other incorporators paid the $250.00 fee plus $1,500.00 for each share of stock. Defendant admitted there was no reference to this fee in any of the corporate records or papers. Plaintiff testified that he was never present with other stockholders when such a matter was brought up, nor did he ever have any discussions with defendant about it. He did not know of his own knowledge whether or not other stockholders paid such a fee.

About the time when the land purchase was to be closed, the incorporators were informed by O'Brien and defendant that the property could be sold at an immediate profit of $50,000.00. This offer was unanimously rejected.

It further appears from the evidence that the plans for the used car arena were abandoned, and thereafter an attempt was made to secure a contract to build a post office on the property and lease it to the government. For a time, it appeared that the corporation would obtain the proposed contract, but not long before February 10, 1954, it was learned that the corporation's bid for the post office had been rejected.

It is defendant's position that the certificate for the two additional shares of stock is not valid. Defendant's version of the incident is that in January 1954, when it appeared likely that the corporation would obtain the post office contract, plaintiff came to his office and asked him if he would be willing to sell for $1,500.00 a share, 2 shares of stock owned by him, and defendant, who was in need of money at the time, agreed to make the sale. He testified that after plaintiff left his office he filled out and dated the certificate but left it in the stock book, which was then in his possession. He further testified he did not thereafter see the stock book or the certificate until his deposition was taken after the present suit was filed. He stated that until that time he was not aware that the stock book or certificate had been removed from his office and was in plaintiff's possession. Defendant further testified that he never asked plaintiff for his check for the purchase price when he prepared the certificate; that none of this stock could be transferred without the consent of all the stockholders; that the secretary had to sign the certificate and attach the corporate seal to it. He stated that plaintiff never made any payment to him for this stock. Defendant at no time submitted the matter to the shareholders for their consideration, nor did he again discuss it with plaintiff. He

stated that no one else knew about the transaction.

The evidence discloses that at the time the corporation was organized, the shareholders entered into an agreement restricting their right to sell their stock. It was provided by this agreement that any stockholder desiring to sell stock should first give notice to the Corporation and other stockholders of his intention to sell, and that the corporation for 30 days thereafter would have the right to purchase said stock at its book value. In the event the corporation should fail or refuse to buy the stock offered within said time, the other stockholders were given the right to buy on the same terms within 60 days thereafter. It was also provided that the 90-day period might be waived in writing, in which event sale of the stock might be sooner made. There is no evidence in the record that there was any waiver of the 90-day period by either the corporation or the stockholders with respect to the alleged sale of stock by defendant to plaintiff. Defendant testified he was going to submit this matter at a stockholders' meeting which was set for January 22, 1954, but the meeting was not held. Defendant testified he never did submit the transaction to the stockholders for their approval because plaintiff never brought in the money for it and for the further reason that the corporation lost the post office deal.

There was evidence on behalf of defendant that plaintiff could not have obtained the certificate on January 22, the date thereof, because on that date defendant's used car office was closed and not open for business.

The first installment of $29,500.00 on the deed of trust note became due on February 10, 1954. The stockholders held a meeting to discuss the payment of this note. Plaintiff and other shareholders refused to advance money to meet the payment due. The money was raised by defendant.

Thereafter, the assets of the corporation were liquidated, and in August, 1956, a resolution was adopted to dissolve the corporation and directing the proper officers to distribute the proceeds to the shareholders, each shareholder to receive $1,461.55 for each share of stock as shown on the stock transfer records on surrender of certificates representing said share. Plaintiff received $17,538.60 as payment for 12 shares. He testified that, after receiving this payment, he talked to defendant and requested he be paid for the 2 additional shares on the same basis, and that defendant refused to do so. He further stated that he believed those 2 shares to be good and valid shares of the corporation when they were delivered to him by defendant; that he had no reason to think otherwise.

Appellant contends that the trial court erred in overruling defendant's motion for a directed verdict in his favor. In support of this contention it is urged there was no fraud shown for the reason that there was no evidence of defendant inducing plaintiff to purchase 14 shares of stock by falsely representing that said shares were valid, subsisting, authorized and registered on the books of the Company, as alleged in plaintiff's petition.

■ It has been held that a misrepresentation may be accomplished not only by the use of language, but also by acts and conduct, or a combination of conduct and concealment, or by conduct and language. Stout v. Carruthersville Hardware Co., 131 Mo.App. 520, 110 S.W. 619; Western Cattle Brokerage Co. v. Gates, 190 Mo. 396, 89 S.W. 382; 37 C.J.S. Fraud § 9, page 226.

■ Under certain circumstances the mere act of contracting may constitute an implied representation of the existence or nonexistence of facts, and expose the maker thereof to liability for fraud for its falsity. Stern v. National City Co., D.C., 25 F.Supp. 948, affirmed 8 Cir., 110 F.2d 601; 37 C.J.S. Fraud § 9, page 226. It has also been held that to cause the issuance of stock of a corporation amounts substantially to a representation that the certificates therefor are regular and valid. MacDonald v. Reich & Lievre, Inc., 100 Cal.App. 736,

281 P. 106. Also misrepresentation by conduct may consist in delivery under contract of an article not bargained for. Handy v. Roberts (Tex.Civ.App.) 165 S.W. 37; Schaffner et al., v. National Supply Co., 80 W.Va. 111, 92 S.E. 580.

The evidence in the case at bar shows that defendant was the principal promoter of the corporation. Plaintiff testified that he entered into an oral agreement with defendant to purchase 14% of the capital stock of the company at $1,500.00 per share; that pursuant to this agreement he paid in $21,000.00, with the understanding that he was then purchasing 14 shares of stock. He was issued only 12 shares and, when he complained to defendant about not receiving the amount he had bargained for, defendant, who was President of the corporation, filled out, signed and delivered to plaintiff a certificate for 2 shares of stock. Plaintiff stated that at the time of the delivery of this certificate he receipted for it in the stock book of the corporation which was then in defendant's possession. All that remained to be done to make it appear that the certificate was valid, was to secure the signature of the Secretary to it, and have the corporate seal affixed, both acts being purely ministerial in nature. This the plaintiff did, but it was defendant's own act that made it possible for a completed certificate to be issued.

The preparing of the certificate by defendant and its delivery could be found by the jury to be an implied representation that it was a valid instrument, which he had bought at the time he delivered the check for $21,000.00, and was a part of a scheme to defraud, which had its inception at the time of the agreement between the parties for the purchase by plaintiff of a 14% interest in the business. That the representation, if made, was false is beyond question for it appears that the entire authorized stock of the corporation was, at that time, fully subscribed for and issued. The certificate in question was a mere scrap of paper, which the jury could reasonably

have found was known by the defendant, and it could therefore be inferred that defendant, by his conduct, which we have said amounted to a false representation, was done willfully and knowingly with intent to deceive.

It is also urged that plaintiff failed to make a case for the jury for the reason that there is no evidence that plaintiff was deceived into acting upon any representations by defendant, or that he relied thereon, or had the right to rely thereon. Suffice it to say, that plaintiff's testimony that he paid $21,000.00 to the corporation pursuant to his agreement with defendant is sufficient to show reliance upon the representations implied by said agreement and payment thereunder. The argument that plaintiff did not have the right to rely upon the defendant's representations is based on the theory that having signed the Articles of Incorporation, plaintiff will not be heard to say that the understanding between the parties was otherwise than as reflected in the Articles. But under the decisions plaintiff's action to recover on the ground of fraud will not be defeated because he had the means of discovering the fraud, when there is a positive representation of fact. McGhee v. Bell, 170 Mo. 121, 70 S.W. 493, 496, 59 L.R.A. 761; Burch v. Schmelig, Mo. App., 300 S.W.2d 838. The same rule should apply to implied representations arising from conduct or agreement. Ignorance of the falsity of the representation may be inferred from plaintiff's conduct in seeking over a period of time to have issued the two additional shares, to which he thought he was entitled, and in accepting Certificate No. 14 without questioning its validity.

It is next urged that there was no evidence that plaintiff sustained any damage as a result of defendant's false representations. There clearly is no merit to this point. According to plaintiff's testimony the agreement was for the purchase by him of 14 shares of stock for $21,000.00. He paid this sum, but received only 12

shares of valid stock, the purchase price of which would have been $18,000.00, and thereafter a worthless certificate for 2 shares. At the time of the dissolution of the corporation, he received payment for only 12 shares and was told there was nothing due on the two worthless shares. Clearly there was damage to plaintiff shown by this evidence.

In our judgment, the trial court did not err in refusing to direct a verdict for defendant.

The next assignment of error is directed to Instruction No. 1 which was given at plaintiff's request. Said instruction is as follows:

"The Court instructs the jury that if you find and believe from the evidence that the plaintiff and defendant agreed that plaintiff was to receive 14% of the capital common stock of King Nat Company, for a consideration of $21,000.00, and that the defendant caused said 14% to be issued in two separate stock certificates, one representing 12 shares and one representing 2 shares, if you so find, and if you further find and believe that the defendant caused said Certificate No. 14 representing 2 shares to be issued, knowing that said certificate was not valid, if you so find, then in so doing defendant was guilty of fraud, and if you further find that each share would have had a value of $1461.55 or a total value of $2923.10 at the time of the dissolution of the corporation, then your verdict shall be in favor of plaintiff and against defendant in the sum of $2923.10 for actual damages."

It is urged by defendant that the instruction is erroneous because it fails to require a finding that plaintiff relied upon the alleged false representations of defendant. The theory of plaintiff's case, as we view it, was that plaintiff was solicited to purchase stock in a corporation and by reason thereof was induced to enter into an oral contract for the purchase of 14% of the corporate stock; that he paid $21,000.00 in reliance on the contract and the implied representation that he was then purchasing a 14% interest in the company; that he received only 12 valid shares and a certificate for 2 shares that were worthless but impliedly represented, when delivered, to be valid stock. Now, in order for a plaintiff to recover for false and fraudulent representations it must be shown, among other things, that the person defrauded relied upon the truth of the representations claimed to be false and suffered damages by reason thereof. This is a fundamental proposition that needs no authority in its support. In the instruction under consideration there is no requirement that the jury find that plaintiff paid the full $21,000.00 for 14% of the corporate stock or that such payment was in reliance on the implied representation that he was then purchasing a 14% interest in the company. For that reason, we believe, the instruction is erroneous and prejudicial. This for the reason that there was evidence in the case from which it could reasonably be inferred that plaintiff did not pay the full amount for 14% of the stock of the corporation or that he relied upon any of the alleged misrepresentations to his damage. There was evidence that $3,000.00 of the amount which plaintiff paid was not for the purchase of stock, but was intended as a promotional fee to defendant, and that the certificate for the 2 invalid shares was delivered to plaintiff pursuant to an agreement made almost a year later, whereby plaintiff purchased 2 shares then owned by defendant. The evidence further shows that plaintiff signed the articles of incorporation in which plaintiff is listed as subscribing to only 12 shares of stock. The foregoing evidence tends to show that plaintiff did not purchase 14 shares, or rely upon the implied representation that he was purchasing 14% of the corporation at the time he paid his money. If this evidence is true, then there would be no cause of action for fraud by reason of the alleged issuance of Certificate No. 14 for the 2 shares of stock for the

reason that plaintiff, having paid nothing for it, suffered no damage, which shows the prejudicial nature of the omission heretofore pointed out.

There are complaints directed against the Instruction No. 1, which, we believe, are unnecessary to discuss. Before another trial, plaintiff will have an opportunity to re-examine the instruction and make such corrections as may be considered necessary in view of the attack made upon it.

The judgment is reversed and cause remanded for a new trial.

WOLFE, J., concurs.

RUDDY, J., not participating